IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **THELMA L. SCHLEICHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:04-1040** |
| | ) | **Judge Trauger** |
| **ASCENSION HEALTH d/b/a** | ) | |
| **ST. THOMAS HOSPITAL,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ASCENSION HEALTH LONG TERM** | ) | |
| **DISABILITY PLAN,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SEDGWICK CLAIMS MANAGEMENT** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This action arises out of plaintiff Thelma L. Schleicher's claim for an award of long-term

disability ("LTD") benefits, pursuant to an employee group disability income policy maintained by

her former employer, St. Thomas Hospital, Inc.  Currently pending before the court are cross-

motions for judgment on the administrative record by plaintiff (Docket No. 28) and by defendants

(Docket No. 31).

1

## I.  **FINDINGS OF FACT**[1]

Plaintiff Thelma Schleicher, now a forty-nine year old female, became employed at St. Thomas Hospital as a registered nurse in the pulmonary surgery unit on August 19, 2002.  (AR 44, 71).  Plaintiff  became a participant in the LTD plan on September 9, 2002.  (AR 45).  The LTD plan sponsor of the Ascension Health Long Term Disability Plan is Ascension Health, formerly known as the Daughters of Charity National Health System, Inc.  (AR 544).  The LTD plan provides that the plan sponsor may appoint one or more persons to serve as administrator.  (AR 547).  The LTD plan further provides that the administrator shall have the discretionary power to decide all questions arising in connection with the administration, interpretation, and application of the LTD plan.  (AR 548).  The duties of the administrator include to "decide all questions relating to the eligibility of Employees to participate or remain Participants hereunder" and "to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as the Administrator deems appropriate . . . ."  (AR 548).

The summary plan description ("SPD") states that the plan sponsor and plan administrator is Ascension Health.  (AR 608).  The SPD identifies the claims administrator as Sedgwick Claims Management Services, Inc.   ("Sedgwick").   (AR 609).   The SPD further states that the plan is jointly administered by the plan administrator and the claims administrator.  (AR 608).  The SPD further provides: "In carrying out their respective responsibilities under the Plan, the Plan administrator and the claims administrator shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."  (AR 602).

---

[1]The facts are gleaned from the administrative record ("AR") which consists of 614 pages filed by defendants *under seal* on February 25, 2005  (Attach. to Docket No. 24).

The LTD plan provides:

> The Plan does not provide benefits for any Disability that is caused by, contributed to by or results from a Pre-Existing Condition that was in existence within three months before the Participant's effective date of coverage.

Plan, Amend. 5, Section 4.12, "Pre-Existing Conditions Exclusion."  (AR 586).  The plan defines

"Pre-Existing Condition" as

> an Injury or Sickness or any related Injury or Sickness that was in existence within the three-month period ending on the day immediately before the date the Participant became covered under this Plan or the date any increased benefit amount option becomes effective.

Plan, Amend. 5, Section 1.1 "Definitions."  (AR 579).

Prior to her employment at St. Thomas Hospital, plaintiff had been unemployed for four years.  (AR 463).  During that time, plaintiff had sought social security disability benefits for a foot injury.  (AR 464).  Plaintiff's treating doctor for the foot injury noted in his medical records that when he explained to plaintiff that she would not be disabled as a result of the foot injury, she expressed disappointment and appeared upset.  (AR 258).  Plaintiff also sought disability benefits prior to working at St. Thomas Hospital for fibromyalgia.[2]  (AR 447).

In December of 1995, January of 1996, and January of 1997  plaintiff was treated by Dr. Linda Monroe with Xanax for anxiety and panic attacks.  (AR 368-369, 375, 387-389).  Plaintiff had consulted with Dr. Erwin Pritchett in mid-2001, at which time Dr. Pritchett noted that plaintiff seemed to suffer from "lots of stress,"  was tearful "all the time," and suffered from panic attacks.  (AR 441-442, 448).  Dr. Pritchett referred plaintiff to a psychiatrist, Dr. Colleen Friddell.  Dr.

---

[2]It is unclear from the Administrative Record whether plaintiff received the benefits she sought.

Friddell's records state:

> 7/18/01   Xanax 0.5 < once daily.
> Stressors → Son-in-law - + suicide in 1995.  → Left daughter with 4
> young kids - daughter went to drugs - then her new fiancé died.
>  → Now helping daughter and grandkids.
>  → Lost job as RN . . . secondary to foot problem.  Husband has
> Hepatitis C.  Puppy died.  Feels a victim.  Stressed out.  Can't get job
> . . . foot problem.  Sleep - okay.  Weight gain.  Hopeless . . .
> Decreased motivation.
>  → Panic disorder.  Past - milder depression.
> Past psych meds: Xanax, Prozac (panic), Zoloft (panic),  Paxil
> (panic), Effexor - hives, St. John's Wort - irritable, Celexa.  No
> mania.
>
> * * *
>
> Family psychiatric history: A lot.
> Mother gave her away at 2 months to "some people."  Took her back
> . . .
> Diagnosis: MDD (major depressive disorder); panic disorder.
> Treatment: Xanax .5 mg, Wellbutrin SR 50 mg a.m., 100 mg twice
> daily.  Counseling.
>
> Mental Status Exam
>         APPEARANCE
>         √ Depressed
>         MOOD
>         √ Depressed
>         √ Anxious

(AR 486-489).  Written across the bottom of Dr. Friddell's July 18, 2001 medical record is a note:

"Only saw once.  Unable to determine prognosis.  Obviously non-compliant with treatment."  (AR

488).  Plaintiff next saw Dr. Pritchett on July 26, 2001.  Her notes indicate: "Saw Dr. Friddell.

Wanted her on Wellbutrin 100 mg once daily . . . Encouraged patient to keep follow-up appointment

with Dr. Friddell."  (AR 443).

Plaintiff again saw Dr. Pritchett on October 24, 2001.  Her notes state in part: "Pamela West

. . . Therapist.  Sees weekly.  Has been helpful . . . .  Has joined support group on Internet . . . . Has

filed for disability regarding fibromyalgia diagnosis . . . . Patient with multiple complaints: (1)

4

abdominal pain, (2) anxiety/panic attacks - supposed to be seeing psychiatrist - gave her a small amount of Xanax to get her to psychiatrist. Xanax 1 mg. ½ tablet every 8 hrs. as needed. No refills, (3) MVP, Anxiety/Panic Attacks - Atenolol 50 mg. to take ½ tablet once per day." (AR 447-448).

Plaintiff was also under the continuing care of Dr. John Simmons for various ailments, including social anxiety and panic disorder. (AR 7, 21, 22). On December 7, 2001, Dr. Simmons noted that plaintiff's weight had "ballooned up about 60 pounds . . . although she has always been a bit heavy." (AR 7). Dr. Simmons' record of plaintiff's December 7, 2001 visit states: "She has been depressed. She has been placed on Xanax and Paxil recently and is actually doing better on this; not crying and does not feel as anxious and nervous as before. She seems to be doing better." (Id.) He refilled her Paxil, Xanax, and Atenolol. (Id.) During this visit, plaintiff reported several recent traumatic events, including a double murder two weeks earlier in a neighboring trailer and problems with her daughter. (Id.)

In January 2002, plaintiff saw Dr. Simmons for "follow up of fibromyalgia, obesity, depression, and anxiety. [Plaintiff was] [n]ot feeling a lot better." (AR 267). Also in early 2002, plaintiff consulted with Dr. Douglas Olsen. (AR 353-354). He noted that she had a five-year history of being morbidly obese and that her past medical history was significant for depression, fibromyalgia, chronic persistent hepatitis, and mitral valve prolapse. (AR 353). He found plaintiff to be a suitable candidate for gastric bypass surgery. (AR 354).

In March 2002, Dr. Robert de la Torre, a psychologist, performed a psychological screening in anticipation of plaintiff's scheduled gastric bypass surgery. (AR 358-359). He found that plaintiff's "mental status was generally within normal limits." (AR 358). In particular, he found there was "[n]o data to suggest patient presents with any major psychological risk factors that would preclude her candidacy" for the procedure. (Id.) He recommended that plaintiff "[c]ontinue with

5

psychotrophic medication for the treatment of depression as prescribed by her primary care physician." (AR 359). Dr. de la Torre subsequently amended his recommendation:

> In the Recommendations section of my report, I erroneously noted that Ms. Schleicher's psychotropic medications were for the treatment of depression. The Paxil and Xanax that she was taking at the time were, in fact, for management of anxiety related problems.

> (AR 162.1).

Dr. de la Torre did not provide any reason for this change or explain how his "erroneous" statement was brought to his attention. (Id.)

Plaintiff successfully underwent gastric bypass surgery on April 3, 2002. (AR 355-357). After a two-month post-operative visit on May 31, 2002, Dr. Olsen, who performed the surgery, noted that plaintiff was "alert, oriented, and does not appear to be in any distress." (AR 343). Again, at her three-month post-operative visit on July 12, 2002, Dr. Olsen described plaintiff as "alert, oriented, and does not appear to be in any distress." (AR 341). Plaintiff began her employment at St. Thomas a few weeks later. (AR 44).

She next consulted Dr. Simmons in September 2002. (AR 21). Dr. Simmons wrote:

> 9/06/02 - Schleicher comes in for her first visit after she had gastric bypass surgery . . . She has lost from 215 pounds down to 145 and is feeling so much better . . . She has had no significant complications thus far . . . . She has basically gotten off the Flexeril, Xenical and Atenolol. She still has to use the Xanax 1 mg at night for sleep. She takes Benadryl 25 mg at bedtime. She is also on Paxil 20 mg every day . . . She is obviously much happier and has basically gotten her life back, able to go back to work. She does want to cut down on her Paxil and will try her on Paxil CR 12.5 mg per day as the initial step down . . . Will also refill her Xanax 1 mg . . .

(AR 21). Plaintiff also saw Dr. Simmons on December 5, 2002. (AR 270). He observed that plaintiff was working full-time and seemed to be "much more at ease with herself and much happier now that her weight is down and she is able to work again. Seems to be much better." (Id.)

Plaintiff's last day of active work at St. Thomas Hospital was March 31, 2003. (AR 44). She apparently passed out at work after learning of the untimely death of her sister-in-law. (AR 28). Plaintiff sought disability benefits due to "Depression" on April 1, 2003. (AR 43, 44). She received twelve (12) weeks of short-term disability ("STD") benefits under the Ascension Health Short-Term Disability Plan. (AR 106). The STD plan does not have a pre-existing condition limitation. She then applied for LTD benefits, indicating her disability was the result of "Depression." (AR 43).

In May 2003, plaintiff was evaluated by Dr. Crystal Morgan, a psychologist. (AR 460-467). She quoted plaintiff as having reported depression "all my life with flare-ups where it gets really bad - to where I cry all the time and can't function - just miserable . . . ." (AR 462). She also noted that plaintiff had a history of panic attacks. (Id.) After an initial counseling session on May 14, 2003, Dr. Morgan made a preliminary diagnosis of Major Depressive Disorder, Recurrent, Moderate. Dr. Morgan wanted to rule out other possible diagnoses such as post traumatic stress disorder, bipolar disorder, and panic disorder with agoraphobia. (AR 41, 462-467).

Also in May 2003, plaintiff saw Dr. Simmons, who noted that plaintiff was "still very, very depressed." (AR 279). He considered increasing her Paxil to 37.5 mg but plaintiff told him that she wanted to stay on 25 mg every day until she sees a psychiatrist. (Id.)

On June 11, 2003, plaintiff saw Dr. Morgan, who noted that plaintiff was still struggling with depression. (AR 469). On June 13, 2003, plaintiff saw Dr. Bhupendra Rajpura, the psychiatrist to whom plaintiff was referred for treatment. (AR 124-125). He wrote:

> 6/13/03 - Patient is seen . . . for the evaluation and treatment of her ongoing depression.
> HISTORY OF PRESENT ILLNESS: . . . The patient feels that she has been feeling increasingly depressed since her sister-in-law (husband's sister) died in March of this year . . . . She has had previous episodes of depression. The first severe depression was in May 2001 when she had to put her puppy to sleep because of Parvo. The patient also notes that she has been depressed all of her life and

> even in-between the episodes of depression she remains depressed.
> . . .
> PAST PSYCHIATRIC HISTORY: . . . The patient has a previous
> history of Prozac which made her more anxious.  Effexor gave her a
> rash.  She notes that she had not taken Zoloft and Wellbutrin long
> enough, and the same was the case with Celexa.  She noted that
> during this time, she was feeling anxious and medication trials were
> terminated prematurely.  She also noted that most of her medications
> were given with Xanax to be taken as needed other than a standing
> dose so when she would feel anxious, it was the depression medicine
> that ended up being discontinued.

(AR 124-125).   His impressions were that plaintiff suffered from Major Depressive Disorder,

recurrent, severe without psychotic features, Probable Dysthymic Disorder, and Panic Disorder,

probably with Agoraphboia.  (AR 400).  He wanted to rule out Bipolar Affective Disorder, Type II.

(Id.)

On June 27, 2003, plaintiff saw Dr. Rajpura again, who noted that plaintiff remained

"severely depressed."  (AR 402).  He noted her diagnoses as "Major Depressive Disorder ?", panic

disorder, and dsythymic disorder.  (Id.)  On July 11, 2003, Dr. Rajpura again noted that plaintiff was

"severely depressed."   (AR 403).   His impressions were "Major Dep." and "Panic Disorder and

Dysthymic Disorder."  (Id.)  Plaintiff saw Dr. Rajpura frequently during August through December

of 2003, and on each occasion he altered dosages and types of medications.  (AR 119, 133, 192, 407,

400, 411, 414, 415).  On each occasion he diagnosed her with "Major Dep." and panic  disorder.

(Id.)

Meanwhile, Plaintiff  attended frequent counseling sessions with Dr. Morgan.  (AR 469-

471).  Following a session on July 15, 2003, Dr. Morgan revised her initial diagnosis and formed

an opinion that plaintiff suffered from bipolar disorder.  (AR 471).

Sedgwick notified plaintiff by letter on October 8, 2003, that her claim for LTD benefits was

denied pursuant to the pre-existing condition exclusion.  (AR 143-144).  The initial denial letter

states:

> We received medical information from your doctor, Dr. Rajpura. After a thorough review of the information, we determined that your disability to be [sic] the result of major depressive disorder and panic disorder . . . . Your medical records document that you have a prior history of diagnosis and treatment for depression preceding your Long Term Disability effective date of September 29, 2002. You were treated for depression in May 2001 after the loss of a beloved pet. It is further documented that you reported periods of depression throughout your lifetime and notes from September 6, 2002 indicate that you were prescribed Paxil . . . . Your disability began on April 1, 2003, which was before you had been covered under this Plan for 12 consecutive months. Therefore, based on the exclusion cited above, the Plan does not provide benefits for your disability and your claim is denied.

(AR 143-144).

On October 10, 2003, plaintiff submitted an eight (8) page letter to Sedgwick appealing the adverse benefit determination. (AR 145-152). In her letter, plaintiff stated that she did not suffer from "major depression or even depression before or within three months of [her] effective date of coverage." (AR 145). She stated that she had suffered from panic disorders since 1975 but had not suffered from any problems with panic disorders since May 2001. (Id.) She stated that she was on a low dose of Paxil 12.5 mg for social anxiety and panic disorder, not depression. She stated that she only suffered from the "blues" after buying a puppy who was diagnosed with Parvo and had to be put to sleep after she spent close to $1,000.00 on him. (Id.)

On October 13, 2003, Dr. Rajpura noted that plaintiff told him that she had not been depressed before. (AR 408). Dr. Morgan's treatment records of the next day revealed:

> Angry with world, partly b/c L-T disability denied for pre-existing. Validated feelings. Became angry in session because diagnosis she has and walked out saying no reason for coming if depression is recurring.

(AR 475). Plaintiff saw Dr. Rajpura a few days later on October 20, 2003, and reported that she

was angry with Dr. Morgan because "She said I have always been depressed. I am not going to see her again." (AR 409).

On October 27, 2003, plaintiff saw Dr. Simmons for follow-up of fibromyalgia and depression. (AR 296). He noted that she continued to be depressed, and that she was having a dispute with her insurance company regarding whether her depression was pre-existing. (Id.) Plaintiff asked him to write a letter to her insurance company on her behalf. (Id.) Dr. Simmons noted that he would write the letter because plaintiff had not been "clinically depressed" during the pre-existing period and that the Paxil she was taking was for social anxiety disorder, not depression. (Id.)

Dr. Simmons submitted the requested letter to Sedgwick, in which he wrote that he was aware plaintiff was in a dispute with her insurance company concerning the company's determination that plaintiff's depression was a pre-existing condition. He stated that the company had erroneously assumed that the Paxil plaintiff was taking was for depression. He stated that plaintiff was on Paxil for social anxiety and panic disorder, not depression. He wrote that plaintiff experienced a severe major depression for the first time in her life following the untimely death of two close family members. (AR 159-160). He opined: "This depressed condition should not be considered pre-existing since it was not. Her Paxil had been for social anxiety disorder, not depression." (AR 159-160).

On December 4, 2003, Sedgwick denied plaintiff's claim on appeal. (AR 167-168). The appeals coordinator explained:

> The records clearly support the existence of her psychiatric
> symptoms prior to, immediately prior to, and leading up to the
> moment of her employment, and continuation beyond the start date
> of her employment. Her primary care physician's opinion carries
> much less credibility than that of her treating psychiatrist and it is his

> clear presentation of the history which supports the pre-existence of
> the employee's disabling psychiatric condition.

(AR 167-168).

On December 23, 2003, plaintiff's attorney wrote a letter to Sedgwick advising Sedgwick of his representation of plaintiff and requesting a copy of the claims file. (AR 177). On January 28, 2004, Sedgwick provided the attorney with a copy of the claims file and relevant LTD Plan documents. (AR 179).

On March 26, 2004, plaintiff's attorney sent Sedgwick a follow-up letter asking that it reconsider the December 4, 2003 decision to deny benefits. He enclosed Dr. Rajpura's medical records for the dates of June 27, 2003, through December 15, 2003, and a letter from Dr. Rajpura, in which Dr. Rajpura changed his diagnosis of plaintiff from Major Depressive Disorder, Recurrent, Severe Without Psychotic Features to Major Depressive Disorder, Single Episode, Severe Without Psychosis and Panic Disorder. (AR 183-186). Dr. Rajpura explained that he changed plaintiff's diagnosis after getting to know her better, after having conducted a more thorough evaluation of her history, and after having reviewed her medical records. (AR 185-186). He stated that "[n]one of the records" he reviewed "categorically documented that patient was actually evaluated and met DSM-IV criteria for Major Depressive D/O." (AR 185). He noted that the fact that plaintiff had been able to function and work went against a diagnosis of Major Depressive Disorder as described by the DSM-IV. (AR 185-186).

By letter dated April 13, 2004, Sedgwick advised plaintiff's attorney that it was affording plaintiff a second appeal, even though the Plan did not allow for more than one appeal. (AR 202-203). Sedgwick explained that the second appeal was "necessitated by the now conflicting accounts of Ms. Schleicher's medical history received from Dr. Rajpura, the references to Dr. Polling in Dr.

11

Rajpura's letter, the conflict between the content of Dr. Simmons' medical records and the opinions set forth in his letter of October 27, 2003, and the references to Dr. Morgan's opinions about Ms. Schleicher's history of depression contained in Dr. Rajpura's October 20, 2003 note." (AR 202). In connection with the second appeal, Sedgwick required plaintiff to complete a mental health questionnaire, which asked her to identify all health care providers who had ever treated her for any mental health condition. (AR 202-206). The questionnaire stated: "Any misstatements or omissions of information shall result in the denial of your claim." (AR 204-206).

On April 19, 2004, plaintiff returned the questionnaire to Sedgwick. (AR 218-221). Plaintiff identified Drs. Simmons, Rajpura, Morgan, de la Torre, Olsen, Pritchett, Monroe, Polling, Davis, and Harper. (Id.) Plaintiff also stated that she had seen a counselor who referred her to Dr. Polling whose name she could not remember. (Id.) She also stated that she was treated in Nashville for panic disorder but could not remember the name of the treating physician. (Id.)

Sedgwick never received Dr. Polling's medical records. Presumably, plaintiff's attorney was able to obtain a copy of them, as is evidenced by the letter he wrote to Dr. Polling dated September 9, 2004. (AR 483). In his letter, plaintiff's attorney asked Dr. Polling to correct certain "errors" in his November 8, 2001 report. (Id.) Evidently, Dr. Polling's report indicated that plaintiff had "recurrent depression." (Id.) Plaintiff's attorney asked Dr. Polling to correct that error on the basis that plaintiff had only been diagnosed with panic disorder when she saw Dr. Polling, not depression. (Id.)

On November 11, 2004, Sedgwick notified plaintiff by letter that it was upholding its previous denial of benefits pursuant to the pre-existing condition exclusion. (AR 495). The denial letter stated, in part, as follows:

> The medical records submitted showed that you have struggled over much of your life with significant psychiatric disorder. In particular,

12

the evaluation of Dr. Rajpura, clearly pointed out that your major depressive disorder is recurrent. Although Dr. Rajpura attempted to state that your current symptoms [sic] is a new condition; [sic] the opinion of the independent physician advisor is that this is inaccurate. The presence of panic symptoms, a form of anxiety, does not negate the fact that you have been treated for an affective disorder for approximately 10 years.

Given that the definition is based on whether you have experienced a same or similar illness or injury during the period in question, you meet this condition and therefore your condition is pre-existing. Accordingly, we reached the decision that the initial denial should be upheld. This decision is final and binding.

(Id.)

On November 19, 2004, plaintiff filed the instant action, asserting that defendants had wrongfully denied LTD benefits to her in violation of 29 U.S.C. § 1132(a)(1)(B). (Docket No. 1). Plaintiff seeks to have this court overturn the claims administrator's decision that plaintiff's alleged disability was caused by, contributed to, or resulted from a pre-existing condition as that term is defined in the LTD plan. Plaintiff seeks an order requiring the payment of LTD benefits from September 28, 2003 until she is able to perform the duties of her occupation at St. Thomas Hospital or until September 28, 2005, which is the maximum 24-month period allowed for a mental illness disability, whichever comes first. Plaintiff also seeks prejudgment interest on any past due benefits, along with attorney's fees and costs.

Plaintiff filed an amended complaint on January 18, 2005 (Docket No. 17), a second amended complaint on February 3, 2005 (Docket No. 19), and a third amended complaint on February 16, 2005 (Docket No. 22). Defendants timely filed answers to each of plaintiff's complaints. (Docket Nos. 8, 23, and 27). Defendants filed the administrative record on March 1, 2005 (Docket No. 24), and requested that the record be kept under seal as it contains confidential

medical and financial information regarding plaintiff.  (Docket No. 25).  The court granted

defendants' request and the record remains under seal.  (Docket No. 26).

## II.    <u>CONCLUSIONS OF LAW</u>

Plaintiff moved for judgment on the administrative record on April 25, 2005 (Docket No.

28).  Defendants sought and received an extension within which to respond to plaintiff's motion.

(Docket No. 30).  Defendants filed a response to plaintiff's motion and a cross-motion for judgment

on the administrative record on May 25, 2005 (Docket Nos. 31, 32).  Plaintiff has not responded to

defendants' cross-motion.[3]

## A.    **Applicability of the Health Insurance Portability and Accountability Act ("HIPAA")**

In her motion for judgment on the administrative record, plaintiff first asserts that the pre-

existing condition exclusion is unenforceable because it is contrary to regulations promulgated under

HIPAA. (Docket No.  29 at 15-16).   In response, defendants contend that (1) plaintiff did not raise

HIPAA or unenforceability in her pleadings, and such an argument is beyond the scope of the

pleadings and should not be considered by the court;  (2) HIPAA does not create a private right of

action; and (3) HIPAA applies exclusively to health coverage plans.   (Docket No. 32 at 15).

It is defendants' third argument that quickly puts plaintiff's theory to rest.  The HIPAA

specifically exempts "disability income insurance" from its coverage.  42 U.S.C. § 300gg-

91(c)(1)(A).   <u>See</u> <u>Parker v. Metro. Life Ins. Co.</u>, 121 F.3d 1006, 1018 (6th Cir. 1997)(recognizing

that HIPAA does not regulate disability income insurance); <u>Rogers v. Dep't of Health and Envtl.</u>

<u>Control</u>, 174 F.3d 431, 436 (4th Cir. 1999)(citing <u>Parker</u> for same proposition).  Because HIPAA

---

[3]Under the Local Rules, failure to file a timely response  to a motion indicates that there is
no opposition to the motion.  Local Rule 8(b)(3).  The court, nevertheless, has dealt with the issues
on their merits.

14

applies exclusively to health coverage plans, the statutes, regulations, and examples on which plaintiff relies are inapplicable to the pre-existing condition exclusion contained in the disability plan at issue in this case. Plaintiff has cited to no statute or regulation limiting pre-existing conditions exclusions in disability plans. As such, Ascension had the right to determine what risks it would and would not take. Ascension opted not to take on risks meeting the definition of a pre-existing condition. Thus, plaintiff's HIPAA argument fails.

**B.     Standard of Review**

The Supreme Court instructs that a denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The language of the plan determines whether the court must apply the arbitrary and capricious standard of review or whether the court must review the determination de novo. If the language of the plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, the highly deferential arbitrary and capricious standard applies. Id. "While 'magic words' are unnecessary to vest discretion in the plan administrator and trigger the arbitrary and capricious standard of review, this circuit has consistently required that a plan contain 'a clear grant of discretion [to the administrator] to determine benefits or interpret the plan.'" Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998)(en banc)(quoting Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1373 (6th Cir. 1994)(emphasis in original)).

Here, the relevant plan language provides that the administrator shall have the discretionary power to decide all questions arising in connection with the administration, interpretation, and application of the LTD plan. (AR 548). The duties of the administrator include to "decide all

questions relating to the eligibility of Employees to participate or remain Participants hereunder" and "to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as the Administrator deems appropriate . . . ." (AR 548).

Plaintiff maintains in her motion for judgment on the administrative record that there is no proof before the court of the appointment of Sedgwick as claims administrator. However, the language of the SPD belies plaintiff's assertion. The SPD identifies the claims administrator as Sedgwick. (AR 609). The SPD states that the plan sponsor and plan administrator is Ascension Health. (AR 608). The SPD further states that the plan is jointly administered by the plan administrator and the claims administrator. (AR 608). Finally, the SPD provides: "In carrying out their respective responsibilities under the Plan, the Plan administrator and the claims administrator shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." (AR 602).

This plan language is sufficiently clear and express in granting discretionary authority to Sedgwick to interpret the plan and to assess claims for plan benefits. See Univ. Hosps. of Cleveland v. Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000) (finding an express grant of discretion because the "Plan in this case provides that the EBC 'shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan'"). Accordingly, the court finds

that the arbitrary and capricious standard of review applies to Sedgwick's denial of plaintiff's LTD benefits claim.

## C.     Application of Arbitrary and Capricious Standard of Review

Having established the appropriate standard of review, the court must now determine whether Sedgwick's decision denying plaintiff LTD benefits based on the pre-existing condition

16

exclusion was "rational in light of the plan's provisions." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1998). "In other words: When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Smith v. Ameritech, 129 F.3d 857, 863–64 (6th Cir. 1997)(citing Davis v. Ky. Fin. Cos. Retirement Plan, 887 F.2d 698, 693 (6th Cir. 1989) (internal quotations omitted)). "The arbitrary and capricious standard is the least demanding form of judicial review." Hunter v. Caliber Sys., Inc., 220 F.3d 702, 709–10 (6th Cir. 2000).

However, the Sixth Circuit has made clear that the arbitrary and capricious standard of review is not a mere formality:

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us to merely rubber stamp the administrator's decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004). Indeed, "[d]eferential review is not no review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005).

In conducting an arbitrary and capricious review of the administrative record, only the facts known to the administrator or fiduciary at the time it made the decision are considered. Id. at 378-79. Thus, the court's review is confined to the administrative record as it existed on November 11, 2004, when Sedgwick issued its final decision upholding the denial of plaintiff's LTD claim.

Plaintiff urges that Sedgwick's decision to deny an award of LTD benefits was arbitrary and capricious because the evidence does not support Sedgwick's decision and/or Sedgwick overlooked

17

or neglected to consider significant evidence submitted by plaintiff "probably" due to Sedgwick's "unprincipled decision-making process." (Docket No. 29 at 20). Defendants deny these contentions and maintain that Sedgwick's decision to deny benefits is supported by the administrative record.

Having carefully reviewed the administrative record and the parties' briefs submitted in support of their cross-motions for judgment on the administrative record, the court finds that Sedgwick's decision to deny an award of long term disability benefits to plaintiff was not arbitrary and capricious. That is to say, the record supports a "reasoned explanation" for Sedgwick's decision to apply the pre-existing condition exclusion under these facts. See Williams v. Intel Paper Co., 227 F.3d 706, 712 (6th Cir. 2000).

At issue is whether plaintiff's claimed disability (depression) was caused by, contributed to by, or resulted from a pre-existing condition, and therefore not covered under the plan. Under the plan, if an employee has not been performing the "[m]aterial duties" of her "[r]egular occupation" for at least twelve consecutive months following the participant's effective date of coverage or following the effective date of any increased benefit amount option, she is subject to a pre-existing condition limitation on coverage. (AR 586). The exclusion provides:

> The Plan does not provide benefits for any Disability that is caused by, contributed to by or results from a Pre-Existing Condition that was in existence within three months before the Participant's effective date of coverage.

(AR 586). The plan defines "Pre-Existing Condition" as

> an Injury or Sickness or any related Injury or Sickness that was in existence within the three-month period ending on the day immediately before the date the Participant became covered under this Plan or the date any increased benefit amount option becomes effective.

18

(AR 579). "Sickness" is defined as "an illness, disease, medical condition or pregnancy." (AR 580). The plan does not define "in existence."

It is undisputed that plaintiff had been employed for less than a year at St. Thomas Hospital at the time she sought LTD benefits and was therefore subject to the pre-existing condition exclusion contained in the LTD plan. (AR 43). The effective date for plaintiff's insurance was September 29, 2002. (AR 43). Thus, the three month pre-existing condition exclusionary period ran from June 29, 2002 through September 28, 2002.[4] Sedgwick determined that plaintiff was not eligible to receive LTD benefits because her alleged disability is depression, and plaintiff suffered from depression, anxiety, and panic disorder and received treatment for depression, anxiety, and panic disorder within the exclusion period prior to becoming a participant in the plan. (AR 143-144, 167-168, 495).

Plaintiff asserts that the LTD plan language requires a pre-existing condition to be certified by a licensed psychiatrist, and that plaintiff never suffered from a mental illness certified by a licensed psychiatrist prior to March 31, 2003. (Docket No. 29 at 20-21). Plaintiff is mistaken on both assertions. There is no requirement in the plan that plaintiff's pre-existing condition be certified by a physician, psychiatrist, or otherwise. Even if such a requirement existed, however, psychiatrist Dr. Colleen Friddell, whose name was not disclosed to Sedgwick by plaintiff, and whose records

---

[4]In their briefs, the parties consistently refer to the three-month period preceding March 31, 2003, as the pre-existing condition exclusion period. March 31, 2003, is the last day plaintiff worked at St. Thomas. However, the plan counts the three-month exclusion period from the participant's effective date of coverage, not the last day the participant worked. Plaintiff, in her own handwriting, refers to the proper exclusion period in her appeal of the initial denial of benefits claim, which is included in the administrative record. (AR 145).

were apparently not shared with Drs. Simmons or Rajpura, diagnosed plaintiff with Major Depressive Disorder on July 18, 2001.  (AR 487-489).

Even if plaintiff did not previously suffer from Major Depressive Disorder as she claims, which is belied by the administrative record, she was treated for depression beginning in July 2001 through the present, and she took Paxil and Xanax during that time, which includes the exclusionary period,  for her depression, panic attacks, and anxiety disorder, or a combination of all three ailments.  While plaintiff maintains that she only suffered from "the blues" previously, the medical records received by Sedgwick reflect plaintiff's admission of a long history of depression, for which she took anti-depressant medicine.  Dr. Simmons noted in December of 2001 that plaintiff had been "depressed.  She has been placed on Xanax and Paxil recently and is actually doing better on this; not crying and does not feel as anxious and nervous as before."  (AR 7).  In January of 2002, Dr. Simmons saw plaintiff for "follow up of fibromyalgia, obesity, depression, and anxiety." (AR 267). He noted that plaintiff was "[n]ot feeling a lot better."  (Id.)    In March of 2002, Dr. de la Torre wrote that after her gastric bypass surgery, plaintiff should "[c]ontinue with psychotrophic medication for the treatment of her depression as prescribed by her primary care physician."  (AR 359).  In March 2003, plaintiff told  psychologist Dr. Morgan that she had suffered from depression "all my life with flare-ups where it gets really bad - to where I cry all the time and can't function - just miserable . . . ." (AR 462).  Based on her initial counseling session with plaintiff, Dr. Morgan diagnosed plaintiff with Major Depressive Disorder, <u>recurrent</u>, moderate.  (Id.)   In June of 2003, Dr. Rajpura noted that plaintiff "has had previous episodes of depression" and that plaintiff "also notes that she has been depressed all of her life and even in-between the episodes of depression she remains depressed."  (AR 124-125).  He diagnosed plaintiff with Major Depressive Disorder, <u>recurrent,</u> severe without psychotic features at that time.  (Id.)

Plaintiff's history of panic attacks and anxiety goes back to 1995, when Dr. Monroe treated plaintiff with Xanax for anxiety and panic attacks. (AR 368-369). Dr. Monroe continued to treat plaintiff for anxiety and panic attacks over the next two years. (AR 375, 387-389). Dr. Pritchett noted that plaintiff suffered from panic attacks in mid-2001, and referred her to a psychiatrist. (AR 441-442, 448). The psychiatrist to whom Dr. Pritchett referred plaintiff diagnosed her with both Major Depressive Disorder and panic disorder in July of 2001. (AR 486-489). In October of 2001, Dr. Pritchett noted that plaintiff complained of anxiety and panic attacks and was supposed to be seeing a psychiatrist. (AR 447-448). Dr. Simmons noted that plaintiff suffered from anxiety in December of 2001 (AR 7), and in January of 2002 (AR 267).

Plaintiff contends that Sedgwick arbitrarily and capriciously failed to consider the opinions of Drs. Simmons, Rajpura, and de la Torre provided in support of plaintiff's second appeal, which contradict prior records submitted by the same doctors. Dr. Simmons' letter submitted on appeal stated that plaintiff had not been "clinically depressed" during the pre-existing period, but his contemporaneously-recorded medical notes of December 7, 2001, state that plaintiff had been depressed and indicate his impression of "depression." (AR 7). Dr. Rajpura claims that he changed his diagnosis of plaintiff from Major Depressive Disorder, recurrent, to Major Depressive Disorder, single episode, after reviewing medical records which were incomplete at the time, and after getting to know plaintiff better. (AR 185-186). However, plaintiff had told Dr. Rajpura in her words about her long history of depression (AR 124-125) and only changed her story after Sedgwick's initial denial of her claim for LTD benefits, claiming that she had not been depressed before. (AR 408).

The very first sentence of the medical record from plaintiff's first visit with Dr. Rajpura states: "Patient is seen . . . for the evaluation and treatment of her <u>ongoing</u> depression." (AR 124-

125)(emphasis added). Dr. de la Torre did not provide any reason for his change.

Under these circumstances, Sedgwick could have reasonably determined that Drs. Simmons, Rajpura, and de la Torre changed their diagnosis of plaintiff or altered other information in plaintiff's medical records after the fact for the purpose of assisting her in gaining LTD benefits, and therefore Sedgwick opted to afford very little or no weight to them. See Raskin v. UNUM Provident Corp., 121 Fed. Appx. 96 (6th Cir. 2005)(finding that ERISA plan administrator's denial of participant's claim for LTD benefits was not arbitrary and capricious where plaintiff's treating physicians both initially reported that plaintiff could return to work without any restrictions or limitations and, only after learning that his benefits were being discontinued, did the doctors change their opinions).

Plaintiff contends that Sedgwick's decision-making process was "unprincipled" and that the physician advisors were unidentified and not independent. However, plaintiff offers no evidence to support her contention. Sedgwick afforded plaintiff a second appeal of the denial of her benefits, which was a right not provided by the LTD plan. (AR 202). Plaintiff was represented by legal counsel prior to and during the second appeal. (AR 177). Although the denial letter from the first appeal did not contain the name of the reviewing physician, the claims file contained the physician's name, as well as his bill for his services. (AR 166). Plaintiff's attorney was provided with the plan documents and the claims file. (AR 179).

Based on all of the evidence in the administrative record, the court finds that it was reasonable for Sedgwick to conclude that plaintiff suffered from and received treatment for depression, anxiety, and/or panic attacks prior to, during, and following the exclusionary period.

Even if the court were to conclude that plaintiff's depression was not "in existence" during the exclusionary period, Sedgwick's decision must still be affirmed. Plaintiff concedes that she suffered from anxiety during the exclusionary period (AR 145), and her medical records indicate that she suffered from anxiety as part of or along with her disabling condition (AR 126). In other words, Sedgwick could have reasonably concluded that plaintiff's anxiety contributed to her disability. The plan language only requires that plaintiff have suffered from "any related Injury or Sickness" during the exclusion period for the exclusion to apply. See e.g., Moore v. Reliance Standard Ins. Co., No. CIV.A.00-040, 2000 WL 1537990, * (E.D. La. Oct. 17, 2000)(finding that "evidence presented to the Court overwhelmingly indicates that plaintiff complained of anxiety attacks after she stopped working and that these attacks at least contributed to her disability. Under the plan, a pre-existing condition need only contribute to the disability; it need not be the sole cause of the disability.").

In any event, the court points out that Sedgwick could have denied plaintiff's claim for benefits simply based on the fact that she failed to disclose the name of Dr. Colleen Friddell on the mental health questionnaire provided by Sedgwick. The questionnaire plainly stated: "Any misstatements or omissions of information shall result in the denial of your claim." (AR 204-206). On the form, Plaintiff identified ten health care providers by name and two whose names she could not remember. (AR 218-221). Plaintiff disclosed that one of the providers whose name she could not remember treated her for panic disorder. (Id.) According to plaintiff, the other unnamed provider was a counselor who referred her to Dr. Polling. (Id.) Although plaintiff could have argued that this unnamed counselor was Dr. Friddell, she did not. Moreover, there is no indication in Dr. Friddell's notes that she referred plaintiff to anyone, as Dr. Friddell wrote: "Only saw once. Unable to determine prognosis. Obviously non-compliant with treatment." (AR 488). Thus, the court could deny plaintiff's motion for that reason alone.

### III. CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the administrative record (Docket No. 28) will be **DENIED** and defendants' motion for judgment on the administrative record (Docket No. 31) will be **GRANTED**. The decision to deny long-term disability benefits to plaintiff under the pre-existing conditions exclusion is hereby **AFFIRMED**.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge